PAMELA L. JOHNSTON, CA Bar No. 132558
  pjohnston@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE: 213.972.4500
FACSIMILE:   213.486.0065

Attorneys for Defendant
HERSEL NEMAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR 14-00521-JAK |
| Plaintiff, | ) **DEFENDANT HERSEL NEMAN'S** |
| | ) **MOTION TO SUPPRESS HIS POST-** |
| vs. | ) **ARREST STATEMENT;** |
| | ) **MEMORANDUM OF POINTS AND** |
| PACIFIC EUROTEX CORP., MORAD | ) **AUTHORITIES; DECLARATIONS;** |
| NEMAN, HERSEL NEMAN, MEHRAN | ) **EXHIBITS** |
| KHALILI, and ALMA VILLALOBOS, | ) |
| | ) **Evidentiary Hearing:** |
| Defendants. | ) Date:     January 8, 2015 |
| | ) Time:     8:30 a.m. |
| | ) Place:    Courtroom 750 |
| | )               Roybal Courthouse |
| | )               Hon. John A. Kronstadt |
| | ) |
| | ) [FARSI INTERPRETER REQUESTED |
| | ) FOR HEARING] |
| | ) |
| | ) Trial Date: February 17, 2015 |
| | ) |

4838-5198-9280.4

## NOTICE OF MOTION AND MOTION TO SUPPRESS HERSEL NEMAN'S POST-ARREST STATEMENT

PLEASE TAKE NOTICE that defendant Hersel Neman ("Hersel Neman") is requesting that this motion to suppress his post-arrest statement be heard on January 8, 2015, at 8:30 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable John A. Kronstadt, which is Courtroom 750 in the Roybal Courthouse, 255 East Temple Street, Los Angeles, California.  Defendant Hersel Neman, by and through his counsel of record, moves to suppress the post-arrest statement made by him during a post-indictment custodial interrogation following his arrest on September 10, 2014.  This notice of motion and motion to suppress his post-arrest statement are based on this motion, the attached Memorandum of Points and Authorities, the attached Declarations of Pamela Johnston, Hersel Neman, Shahin Simon Neman, Susan Aquino and Ali Hashemi-Alavi, the Exhibits attached to the Declarations, other filings in this case, examination of witnesses during the evidentiary hearing on the motion to suppress, and any oral argument that the Court may consider.

This motion is timely brought and noticed in accordance with the Court's December 2, 2014 Order Granting Unopposed Ex Parte Application Setting Briefing and Hearing Schedule for Motions to Suppress.  (Docket No. 93).  Pursuant to the Court's Order, defendant Hersel Neman has timely filed the motion on Thursday, December 4, 2014, and noticed the motion for hearing on the date and time approved by the Court, January 8, 2015, at 8:30 a.m.  Counsel for Hersel Neman also verified with the Court's Clerk that the Court's standing order limiting motions to 10 pages does not apply to the length of motions to suppress.

Respectfully submitted,

Dated:  December 4, 2014

**FOLEY & LARDNER LLP**
PAMELA L. JOHNSTON

By:   ___/s/ Pamela L. Johnston___
PAMELA L. JOHNSTON

Attorneys for Defendant
HERSEL NEMAN

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   FACTS ..................................................................................................... 2

      A.    BACKGROUND OF DEFENDANT HERSEL NEMAN ......................... 2

      B.    THE GOVERNMENT'S INDICTMENT ................................................ 4

      C.    POST-INDICTMENT ARREST OF DEFENDANT HERSEL
            NEMAN ........................................................................................... 5

      D.    COUNSEL WAS DENIED ACCESS TO HERSEL NEMAN PRIOR
            TO HIS INTERROGATION BY LAW ENFORCEMENT
            OFFICERS ....................................................................................... 5

      E.    GOVERNMENT HAS AGREED NOT TO USE ALMA
            VILLALOBOS'S POST-ARREST STATEMENT ................................ 6

      F.    AGENT BROWNING FAILED TO PROPERLY INFORM HERSEL
            NEMAN OF HIS *MIRANDA* RIGHTS .............................................. 7

III.  LEGAL ARGUMENT ............................................................................ 13

      A.    HERSEL NEMAN'S STATEMENT TAKEN IN VIOLATION OF
            HIS *MIRANDA* RIGHTS MUST BE SUPPRESSED .......................... 13

            1.    Custodial Statements Taken in Violation of *Miranda*
                  Must be Suppressed ............................................................ 13

            2.    Hersel Neman Did Not Knowingly and Intelligently
                  Waive His *Miranda* Rights ................................................ 15

            3.    Hersel Neman's Purported *Miranda* Waiver was the
                  Product of Intimidation and Coercion, and Was Thus
                  Not Voluntary ..................................................................... 18

      B.    HERSEL NEMAN'S STATEMENT WAS ELICITED IN
            VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO
            COUNSEL ...................................................................................... 22

IV.   CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Collazo v. Estelle*,
  940 F.2d 411 (9th Cir. 1991) (en banc) ................................................ 19, 20

*Cox v. Del Papa*,
  542 F.3d 669 (9th Cir. 2008) ................................................................ 13, 14

*Deweaver v. Runnels*,
  556 F.3d 995 (9th Cir. 2009) ...................................................................... 15

*Kansas v. Ventris*,
  556 U.S. 586 (2009) ............................................................................. 15, 22

*Michigan v. Harvey*,
  494 U.S. 344 (1990) ...................................................................................... 22

*Miranda v. Arizona*,
  384 U.S. 435 (1966) ...................................................................................... 13

*Moran v. Burbine*,
  475 U.S. 412 (1986) ............................................................... 14, 18, 22, 23

*Patterson v. Illinois*,
  487 U.S. 285 (1988) ................................................................................ 22, 23

*United States v. Bernard S.*,
  795 F.2d 749 (9th Cir. 1986) ...................................................................... 16

*United States v. Binder*,
  769 F.2d 595 (9th Cir. 1985) ...................................................................... 22

*United States v. Crews*,
  502 F.3d 1130 (9th Cir. 2007) ............................................................... 14, 15

*United States v. Doe*,
  155 F.3d 1070 (9th Cir. 1998) (en banc) .................................................. 15

*United States v. Gonzalez*,
  749 F.2d 1329 (9th Cir. 1984) .................................................................... 15

*United States v. Harrison,*
34 F.3d 886 (9th Cir. 1994) .................................................................. 1, 18, 19, 20, 21

*United States v. Leon Guerrero,*
847 F.2d 1363 (9th Cir. 1988) ...................................................................... 19

*United States v. Martinez,*
588 F.2d 1227 (9th Cir. 1978) ...................................................................... 16

*United States v. Shi,*
525 F.3d 709 (9th Cir. 2008) ................................................................... 16, 19

*United States v. Tingle,*
658 F.2d 1332 (9th Cir. 1981) ...................................................................... 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

On September 10, 2014, law enforcement officers handcuffed, shackled, and arrested defendant Hersel Neman at his home after the return of an Indictment issued by a federal grand jury on the previous day, September 9.  (Indictment, Docket No. 1).  Hersel Neman, a native Farsi language speaker with limited English language proficiency, was then transported to the Roybal Courthouse (hereinafter, the "Federal Building") for a post-arrest, post-indictment interrogation and for his initial appearance.  During the interrogation, law enforcement authorities violated Hersel Neman's *Miranda* rights by failing to: 1) read each of the *Miranda* rights, individually, in Farsi to him even though Hersel Neman informed them that his English language skills were only "so-so" and even though there was a Farsi language agent/interpreter in the interrogation room; and 2) provide a Farsi language *Miranda* statement of rights form for Hersel Neman to read and sign, in spite of Hersel Neman's statement that he reads "very little" English.[1]  Hersel Neman's post-arrest, post-indictment statement should thus be suppressed because he did not, and could not, knowingly and intelligently waive his *Miranda* rights.

The law enforcement officers compounded the *Miranda* errors by violating black letter Ninth Circuit precedent of *United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994), when Agent Sean Larrabi told Hersel Neman, in Farsi, that his **failure** to "cooperate" or "work" with the agents would be communicated to the prosecutor.  As the Ninth Circuit noted in *Harrison*, "'[b]ecause there is no legitimate purpose for the statement that a failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.'"  34 F.3d at 891 (quoting *United States v. Tingle*, 658 F.2d 1332, 1336 n.5 (9th Cir. 1981).  Thus, due to *Harrison*, Hersel Neman's post-arrest, post-indictment statement must be suppressed as being the product

---

[1]  A copy of the videotaped interrogation is being provided to the Court in a separate filing.  Moreover, an English language transcript is attached as Exhibit 2, and an official English language translation of the Farsi portions of the statement is attached as Exhibit 3.  A combined transcript with both languages is attached as Exhibit 1.

of illegal coercion.

Finally, Hersel Neman's post-arrest, post-indictment statement must be suppressed because law enforcement officers violated his separate Sixth Amendment right to counsel, which attached on September 9 when the indictment was returned by the grand jury. As noted above, Hersel Neman could not, and did not, expressly waive his Fifth Amendment right to counsel because his *Miranda* waiver was not knowingly and intelligently made and it was a product of illegal coercion. Equally important, however, law enforcement officers interfered with Hersel Neman's counsel's, Shahin Simon Neman ("Simon Neman"), attempts to represent Hersel Neman during his interrogation. Simon Neman was in the Federal Building *before* law enforcement officers started their interrogation of Hersel Neman, and Simon Neman repeatedly told the officers that he represented Hersel Neman, that he wanted to speak to Hersel Neman and that they could not interrogate Hersel Neman outside of counsel's presence. As Hersel Neman did not expressly waive his Sixth Amendment right to counsel and law enforcement officers interfered with counsel's attempts to represent Hersel Neman during his interrogation, his statement must be suppressed on Sixth Amendment grounds.

## II.   FACTS

### A.   BACKGROUND OF DEFENDANT HERSEL NEMAN

Hersel Neman, who is 56 years old, was born in Iran in 1958 and immigrated to the United States in 1987. A native Farsi language speaker, Hersel Neman did not learn English in Iran nor has he ever received any formal English language education, either in Iran or the United States. Hersel Neman has been in the United States for approximately 27 years. Hersel Neman speaks and understands basic business and everyday conversational English. However, he needs a Farsi language translator for legal concepts or other more difficult concepts. Hersel Neman's spoken English language skills are primarily limited to discussing routine and familiar business operations. Hersel Neman is not conversant in common legal concepts, such as an individual's Fifth Amendment *Miranda* rights, nor was he familiar with the term "*Miranda*" prior to his post-indictment

interrogation in this matter.  Prior to his arrest on September 10, 2014, he was not aware of the concept of an individual's *Miranda* rights. (Declaration of Hersel Neman ("H. Neman Decl."), ¶¶ 1, 3-4, 11, 15).[2]

There is an aspect of Hersel Neman's background in Iran that is relevant to this motion to suppress and the coerciveness of the interrogation.  Hersel Neman grew up in Iran but his life and lives of his family changed drastically after the Islamic revolution in 1979 altered the government and daily ways of life there.  Hersel Neman, who is Jewish and comes from a Jewish family, quickly learned after the Islamic revolution that he could not refuse the requests of the police or refuse to answer their questions.  He understood that if he argued with the police, he would disappear, either being executed or sent to prison and never released.  Hersel Neman remembered stories of people being executed or sent to an infamous secret police prison called Evin and never being seen again.  Before he fled Iran, Hersel Neman's uncle and cousins fled Iran to avoid hanging. Importantly for this case, Hersel Neman was arrested by Iran's secret police.  He was handcuffed, blindfolded, and later interrogated for approximately seven hours in Evin. Of course, he was not advised of anything like our *Miranda* warnings.  He was not certain whether he would be killed.  He was fortunate to be released after only seven hours of interrogation, but that experience imprinted on his mind and stays with him until this day.  After his release from Evin, Hersel Neman escaped Iran by walking over the mountains for many days, eventually arriving in the United States after many difficulties. (H. Neman Decl., ¶ 2).

On the day of his arrest here, when he was handcuffed, shackled at the feet, and detained, his mind returned to what he had experienced in that secret police jail in Iran years ago and literally feared for his freedom and his life.  When he was questioned by the agents on September 10, he sincerely believed that unless he answered the agents' questions, he would never be released if he refused to cooperate by answering their

---

[2] Due to page limitations, at the end of each paragraph, all citations to Hersel Neman's Declaration will be cited in the order that they appear in that paragraph.

questions.  (H. Neman Decl., ¶¶ 5, 16).

Here in the United States, Hersel Neman is a co-owner of Pacific Eurotex Corp. (hereinafter, "PEC"), a business that operates as a designer, importer, wholesaler, and exporter of fabrics and textiles, with suppliers in China and customers in the United States and Latin America.  Hersel Neman's primary use of the English language is to discuss the particulars of such designs, purchases and sales, including prices, measurements, orders, colors, and shipments.  When vendors or customers contact Hersel Neman to discuss complex or technical issues regarding design, purchase or sale orders in a non-Farsi language, he relies on his employees to handle or assist in the discussions.  In his ordinary daily business affairs, Hersel Neman relies on his employees to read and write for him in English, as he is virtually illiterate in written English.  Indeed, when reviewing anything other than formulaic transaction-based documents like invoices and purchase orders,[3] Hersel Neman relies on others for Farsi language translations and advice.  Hersel Neman does not have the ability to read or comprehend legal, complex or technical English.  Simon Neman is a lawyer who works for a different Neman family business, assists Hersel Neman at times with PEC business and communicates with Hersel Neman in Farsi and in English.  Outside of PEC's offices, Hersel Neman communicates with his family and friends almost exclusively in Farsi.  (H. Neman Decl., ¶¶ 3-4;  Declaration of Susan Aquino, ¶¶ 4-7).

**B.    THE GOVERNMENT'S INDICTMENT**

On September 9, 2014, a federal grand jury issued an Indictment against Hersel Neman and co-defendants PEC, Morad Neman, Mehran Khalili, and Alma Villalobos. The Indictment charges Hersel Neman with a variety of federal crimes, including conspiracy to launder money, structuring financial transactions to evade reporting obligations, and failure to file CTRs.  (Indictment, Docket No. 1).

---

[3] A copy of a PEC purchase order is attached to the Declaration of Susan Aquino as Exhibit 8.

### C.      POST-INDICTMENT ARREST OF DEFENDANT HERSEL NEMAN

On September 10, 2014, the day after the Indictment, at approximately 6:30 a.m.,
law enforcement officers executed an arrest warrant at Hersel Neman's home.  Law
enforcement officers knocked on the door and demanded that they be let in.  When Hersel
Neman opened the door, he was pushed into the corner and detained while officers
conducted a sweep of the home.  Hersel Neman's wife and son were also detained by law
enforcement officers during the execution of the arrest warrant and the sweep.  Hersel
Neman was detained in handcuffs and leg shackles in his home for over an hour before
being transported to the Federal Building for interrogation.  At no point during his
detention and arrest at his home did law enforcement officers inform Hersel Neman of his
*Miranda* rights, either in English or Farsi.  (H. Neman Decl., at ¶¶ 5-8).

### D.      COUNSEL WAS DENIED ACCESS TO HERSEL NEMAN PRIOR
###         TO HIS INTERROGATION BY LAW ENFORCEMENT OFFICERS

Early that same morning of September 10, 2014, Simon Neman, Hersel Neman's
counsel, learned that federal law enforcement officers had arrested Hersel Neman and
were taking him to the Federal Building.  Simon Neman left immediately to meet Hersel
Neman there and communicated with Hersel Neman's spouse, either directly or
indirectly, that he was leaving to meet Hersel Neman at the Federal Building.
(Declaration of Simon Neman ("S. Neman Decl."), ¶3).

By approximately 9:00 a.m., on September 10, 2014, Simon Neman had arrived at
the Federal Building, went directly to the United States Marshals office on the third floor,
and signed in with the Marshals' service.  Simon Neman explained to the law
enforcement officers that Hersel Neman had been arrested earlier that day in his home,
that he (Simon Neman) was Hersel Neman's counsel, that he wanted to speak to Hersel
Neman, and that Hersel Neman could not be questioned outside of his presence.  Indeed,
during the morning of September 10, 2014, Simon Neman: 1) signed-in with law
enforcement officers as Hersel Neman's counsel; 2) informed various law enforcement
officers on multiple occasions that he was Hersel Neman's counsel; 3) stated that he

needed to speak with Hersel Neman; and 4) stated that no questioning of Hersel Neman should occur outside of Simon Neman's presence.  In spite of Simon Neman's repeated requests, Simon Neman was never taken to his client, was not brought to the interrogation room, and did not see Hersel Neman until *after* Hersel Neman had been interrogated.  (S. Neman Decl., at ¶¶ 4-9).  Hersel Neman was denied access to his counsel.

## E.   GOVERNMENT HAS AGREED NOT TO USE ALMA VILLALOBOS'S POST-ARREST STATEMENT

Co-defendant Alma Villalobos ("Villalobos") was also arrested on the morning of September 10, 2014.  (Declaration of Pamela L. Johnston ("Johnston Decl."), ¶ 9, Ex. 7).  According to the video recording of her post-arrest interrogation, law enforcement officers questioned Villalobos on the morning of September 10, **before they questioned Hersel Neman,** specifically from approximately 9:28 a.m. until 9:47 a.m. in an interrogation room at the Federal Building.  (Johnston Decl., ¶ 9, Ex. 7, ¶11, Ex. 10).

The government has agreed not to seek to admit Villalobos' post-arrest statement given by Villalobos on September 10.  (Johnston Decl., ¶ 13).  As the discussion below reveals, Special Agent Michael Browning ("Agent Browning") failed to cease questioning Villalobos even though she asked four times for counsel to be present; this agent is the same one who questioned Hersel Neman.  *See* transcript of her questioning (Johnston Decl., ¶ 6, Ex. 4).

Agent Browning read Villalobos her *Miranda* rights in English, one-by-one, and then Special Agent Eric Mangona ("Agent Mangona") translated each *Miranda* right into Tagalog, Villalobos's native language.  Agent Browning understood the importance of translating the *Miranda* rights to her in Tagalog, telling Villalobos that Agent Mangona was going to "read them back to you in your native language, so you understand them okay, and after everything, if you have any questions we'll go over what these mean. Okay, do you understand?"  (Johnston Decl., ¶ 6, Ex. 4; ¶11, Ex. 10).  Indeed, Agent Browning was careful to read each of the *Miranda* rights, individually, waited until it was translated to her in Tagalog and waited until Villalobos responded in the affirmative to

the Tagalog translation.  As discussed below, this is precisely what Agent Browning omitted when questioning Hersel Neman later; this omission appears to have been purposeful and likely driven by Villalobos' four assertions of her right to counsel.

As soon as Agent Browning and Agent Mangona finish reading Villalobos her *Miranda* rights in English and Tagalog, Villalobos stated that she would "rather give a statement with an attorney."  Instead of complying with Villalobos's first request for an attorney, Agent Browning and Agent Mangona attempted to persuade her to answer questions without the assistance of an attorney, with Agent Browning noting that he was trying to give Villalobos "an opportunity right now to really benefit yourself and help yourself in this situation."  In response, Villalobos asked "can I not talk to my attorney about this case so I can defend myself?"  Agent Browning continued to try to persuade Villalobos to speak to the law enforcement officers without an attorney, noting he was giving her "an opportunity to really start the process and be very cooperative with us because I think it is going to be better for you in the long run."  Villalobos made her third request for an attorney, stating "I'd rather have an attorney please."  The agents ignored Villalobos third request for an attorney and continued to question her until Villalobos made her fourth request for an attorney, noting that she would "feel more comfortable having an attorney present[.]"  The agents continued to question Villalobos until she began to cry and could not continue.  (Johnston Decl., ¶ 6, Ex. 4; ¶11, Ex. 10).

## F.     AGENT BROWNING FAILED TO PROPERLY INFORM HERSEL NEMAN OF HIS *MIRANDA* RIGHTS

According to the video recording of the interrogation and the agents' notes, law enforcement officers began questioning Hersel Neman at 10:34 a.m., approximately 45 minutes after terminating Villalobos's interrogation.  (Johnston Decl., ¶ 8, Ex. 6; ¶ 10, Ex. 9).  Agent Browning, the same agent who conducted the interrogation of Villalobos, conducted Hersel Neman's post-indictment interrogation in the Federal Building.  Before the time law enforcement officers began questioning Hersel Neman, Simon Neman had made contact with law enforcement officers within the Federal Building and repeatedly

asked to speak to Hersel Neman and repeatedly informed the law enforcement officers that no questioning of Hersel Neman could occur without counsel present.  (S. Neman Decl., ¶¶ 5-7).

Agent Michael Browning started the interrogation by asking Hersel Neman if he spoke English, to which Hersel Neman responded nonverbally, gesturing "so-so" with his hand.  (Johnston Decl., ¶ 10, Ex. 9 at 0:58).  The interrogation proceeded as follows[4]:

**Agent Browning:**  You speak okay English?

[Video: Hersel Neman gestures with his hand: so–so]

**Agent Browning:**  Very, very little?  Kinda like my Spanish.  My Spanish is awesome.

…

**Agent Browning:**  Okay, Hersel.  I'm Special Agent Michael Browning.  Okay?  [Video: Hersel Neman nods yes]  This is my partner, Special Agent Jenks.  [Video: Hersel Neman nods] This is Sean, [Video: Hersel Neman nods] another special Agent with HSI.  We're all here, he's going to serve as your translator.  Okay?  So do you understand what I'm saying right now, or do you need him to translate as I go?

***Agent Sean Larrabi:[5]  Do you speak English well?***

***Hersel Neman:  I understand it to an extent. The difficult words***

***Agent Larrabi:  Do you want me to "translate" for you, or when he talks to you***

***Hersel Neman:  If I didn't understand something***

**Agent Larrabi:**  He wants, he prefers to have you talk to him.  He doesn't understand then I'll step in.

**Agent Browning:**  Okay.

---

[4] The italicized portions of the transcript are the portions of the interrogation translated from Farsi into English.
[5] According to agent interview notes, the Farsi speaking agent/interpreter, identified in the video recording of the interrogation as Agent Sean, is believed to be Agent Sean Larrabi.  (Johnston Decl. ¶ 8, Ex. 6).

**Hersel Neman:**  Some special word I don't understand.  I understand.

*Agent Larrabi:  If you didn't understand something, ask me.*

**Agent Browning:**  No, no, that's fine.  I'll swing ahead and go over why you're here.  You know that you've been arrested.  Okay.  You've been indicted on money laundering charges tied to your business.  Okay?  So that's what all this is about.  I'm sure it's obviously been explained to you up in this, up until this point.  So we don't want you sitting here wondering why you're here.  Okay.

**Hersel Neman:**  Okay.

**Agent Browning:**  So obviously, after everything, you're sitting here for a reason, so we want to talk to you.  Okay?  [Video: Hersel Neman nods yes.]  When we talk to you, we want you to be upfront and honest, you know, we don't want you to sit here and lie and try to [Video: Hersel Neman nods], you know, cause a lot of stuff, we already know in our investigation.

**Hersel Neman:**  Okay.

**Agent Browning:**  And lying doesn't really help anybody.  The more honest you are, I think it helps out everybody.  [Video: Hersel Neman nods.]  Don't think of us as fools in this and plus, the more cooperative and honest you are, then I can relay that to the U.S. Attorney and she'll take that in to account with everything, so being cooperative kind of helps everybody out.  So just kind of keep that in mind, okay?

**Agent Browning:**  So, I don't know if your familiar at all, have you ever been arrested?

**Hersel Neman:**  Yeah.

**Agent Browning:**  Okay.  So, have you ever been presented with *Miranda* rights – do you know what *Miranda* rights are?

[Video:  Hersel Neman does not answer and instead looks at Agent Sean Larrabi.]

*Agent Larrabi:  You have "rights" that when you're arrested. They tell you have the right to speak with us.  Or you don't have to speak to us.  Have they read that to you?*

**Hersel Neman:**  *No*

*Agent Larrabi:  Where did they arrest you, for example?*

*Hersel Neman:  I had some drugs at some time, one cigarette, I had, they arrested me. That's it.*

*Agent Larrabi:  They hand cuffed you and took you to prison. When they took you to prison, did they give you a list of questions (Unintelligible: Translator) didn't they tell you something*

*Hersel Neman:  No*

**Agent Larrabi:**  Uh, he said he has some drugs on him, personal possession, [unintelligible], but he says he's never been read his rights.

**Agent Browning:**  Okay, that's fine.  So, I'm going to read you the form, okay, and then if you have any questions, you can ask and clarify what that means.  This is your statement of your rights.  Whenever someone is arrested, it's called the *Miranda* rights.  Okay?  So, you have the right to remain silent, anything you say can be used against you in a court of law or other proceedings.  You have the right to consult an attorney before making any statement or answering any questions.  You have the right to have an attorney present with you during questioning.  If you cannot afford an attorney, one will be appointed for you before any questioning if you wish.  If you decide to answer questions now, you still have the right to stop the questioning at any time or stop the questioning for the purpose of consulting an attorney.  Okay?  So, if you understand these rights, do you have any questions about them?

[Note from the video:  The agents did not translate the *Miranda* rights to him in Farsi]

**Hersel Neman:  I understand but I don't know if I have to talk or not. [Video: Hersel Neman shrugs]**

(Johnston Decl., ¶ 4, Ex. 1; ¶ 10, Ex. 9; Declaration of Ali Hashemi-Alavi, ¶ 4, Ex. 3).

Here, Agent Browning, the same agent who previously interviewed Villalobos and violated her *Miranda* rights by denying her repeated requests for an attorney, failed to read Hersel Neman his *Miranda* rights individually in Farsi.  Instead, Agent Browning read the entire *Miranda* statement of rights form in English at one time without pause and without asking Hersel Neman if he understood each of his rights, individually.  Agent

Browning did not have each of the individual rights translated into Farsi, even though Hersel Neman had made clear that his command of the English language was only "so-so."  When asked if he understood, Hersel Neman did not answer that he understood; instead, he asked if he was required to speak or not, evidencing his failure to understand his *Miranda* rights.

Agent Browning was aware of the requirement to read each of the *Miranda* rights individually and have it translated, as he had done so during his questioning of Villalobos less than an hour earlier, specifically noting in his interview notes that Villalobos was "read rights in English & Tagalog."  (Johnston Decl., ¶ 9, Ex. 7).  However, Agent Browning failed to read the *Miranda* rights individually or translate them into Farsi, even though there was a Farsi language agent/interpreter in the interrogation room.  Agent Browning's interview notes from Hersel Neman's interrogation do not state "read rights in English & Farsi" but instead merely state "read rights."  (Johnston Decl., ¶ 8, Ex. 6).  This English only approach appears to have been purposeful and intended to cause Hersel Neman to speak without the benefit of him understanding his Fifth Amendment right to be free from self-incrimination.  Agent Browning continued:

> **Agent Browning:**  Um, that's what it is saying, it's saying you don't have to talk.  It's up to you, it's your decision to talk to us or not to talk to us."
>
> **Hersel Neman:**  I don't [Video: Hersel Neman shrugs]
>
> **Agent Browning:**  But like I said before, the cooperation and everything that you do now plays into
>
> **Hersel Neman:**  Okay, let's go, whatever I know I tell you
>
> **Agent Browning:**  Okay, that's fine.  Um, can you do me a favor.  If you want to acknowledge this is just saying that you read your rights and understand what they are.  It's just a form we have.
>
> ***Agent Larrabi:***  *(Unintelligible: Translator) You can read English, right?*
>
> ***Hersel Neman:***  *Very little*
>
> ***Agent Larrabi:***  *These things that he read for you. "initial" here. "print"*

*your name here, Sign here. "print" Your name here. Sign here.  These are just your "rights" If you want me to, I can help you*

**Hersel Neman:**  *It says here it would be bad for me if I don't do the thing*

**Agent Larrabi:**  *Look. Right*

**Agent Larrabi to Agent Browning:**  He's arrested

**Agent Browning to Agent Larrabi:**  Yes.

**Agent Larrabi:**  *They've arrested you  They are talking to you*

**Agent Larrabi:**  *But it is this way that you can talk to them or you may not talk to them. It means any way you like it. But they want to speak with you now.  If you speak with them, it most probably help your "case"* **When he goes to speak with "U.S. Attorney," he will tell them that this guy has cooperated" or has not "cooperated."   He has worked with us or he hasn't worked with us.**  *But we cannot force you to talk.  You can talk to us if you desire to.*

[NOTE:  The agent used the same language held to be coercive in *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) (holding that "there is no legitimate purpose for the statement that failure to cooperate will be reported"), i.e., that the agents would inform the prosecutor that Hersel Neman "has not cooperated."]

[Video: Hersel Neman picks up the pen]

**Hersel Neman:**  *Should I "initial" these?*

**Agent Sean Larrabi:**  *"Initial" these.*

**[NOTE:  From the video, it is clear that Hersel Neman does not look down and does not read the form]**

**Agent Sean Larrabi:**  *Did you understand it all? I can repeat it all for you.*

**Agent Sean Larrabi:**  *And one here*

**Agent Sean Larrabi:** *And then here   Write your complete name*

**Hersel Neman:**  Hersel

**Agent Sean Larrabi:**  Hersel

DEFENDANT HERSEL NEMAN'S MOTION TO SUPPRESS HIS POST-ARREST STATEMENT

-12-

CR 14-00521-JAK

*Agent Sean Larrabi: (Unintelligible)*

**Agent Sean Larrabi:**  Today's the tenth right?

**Agent Michael Browning:**  Right …

*Agent Sean Larrabi: It is the 14ᵗ  Nine, ten, fourteen*

(Johnston Decl., ¶ 4, Ex. 1; ¶ 10, Ex. 9; Declaration of Ali Hashemi-Alavi, ¶ 4, Ex. 3).

In addition to failing to read the *Miranda* rights individually and failing to translate those *Miranda* rights to him in Farsi, Agent Browning had Hersel Neman sign the Statement of Rights form without translating that form to him in Farsi.  Hersel Neman did not read the form – he was unable to do so.  (H. Neman Decl., ¶¶ 13-14).  Instead, the law enforcement officers had Hersel Neman initial and sign his name to the English-only language Statement of Rights form without a Farsi language translation.  (Johnston Decl., ¶ 4, Ex. 1; ¶7, Ex. 5; ¶ 10, Ex. 9).

## III.  LEGAL ARGUMENT

### A.  HERSEL NEMAN'S STATEMENT TAKEN IN VIOLATION OF HIS *MIRANDA* RIGHTS MUST BE SUPPRESSED

#### 1.  Custodial Statements Taken in Violation of *Miranda* Must be Suppressed

In *Miranda v. Arizona*, the Supreme Court held that pursuant to the Fifth Amendment privilege against self-incrimination, the prosecution could not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrated the use of procedural safeguards effective to secure the privilege against self-incrimination.  384 U.S. 435, 444 (1966).  These "procedural safeguards" require that a person in custody: 1) "first be informed in clear and unequivocal terms that he has the right to remain silent;" 2) "that anything said can and will be used against the individual in court;" 3) that he has "a right to consult with a lawyer and to have the lawyer with him during interrogation;" and 4) that "if he is indigent, a lawyer will be appointed to represent him."  *Id.*, at 467-73, 479.

Before any statements made by a suspect in custody during interrogation may be introduced, the government must prove, by a preponderance of evidence, that the defendant knowingly and voluntarily waived his *Miranda* rights.'"  *Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008).  Courts "must indulge every reasonable presumption against waiver of fundamental constitutional rights.'"  *Id.* at 675 (citing *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984)) (internal citations omitted).  The government satisfies its burden of establishing a knowing and voluntary waiver only if it makes two prerequisite showings:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal *both* an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Cox*, 542 F.3d at 675 (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (emphasis in original).

"The distinction between a claim that a *Miranda* waiver was not voluntary, and a claim that such waiver was not knowing and intelligent, is important.  'The voluntariness of a waiver . . . has always depended on the absence of police overreaching.'"  *Cox*, 542 F.3d at 675 (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)).  "In other words, the voluntariness component turns upon external factors, whereas the cognitive component depends upon mental capacity."  *Cox*, 542 F.3d at 675.

A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran,* 475 U.S. at 421; *see also United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007).  Factors that the district court must

consider include:

> "(i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system."

*Crews*, 502 F.3d at 1140.

Moreover, even absent a *Miranda* violation, any statements given involuntarily must be suppressed, as the use of involuntary statements, whether by way of impeachment or otherwise, deprives a defendant of due process of law.  *Deweaver v. Runnels*, 556 F.3d 995, 1002-03 (9th Cir. 2009); *see Kansas v. Ventris*, 556 U.S. 586, 590 (2009).

### 2.   Hersel Neman Did Not Knowingly and Intelligently Waive His *Miranda* Rights

When law enforcement officers entered the interrogation room to interrogate Hersel Neman, they likely understood the proper method for *Mirandizing* a witness whose native language was not English, that is, to read and translate into witness's native language each of the *Miranda* rights individually.  Indeed, Agent Browning, the agent interrogating Hersel Neman, had completed the interrogation of Villalobos only 45 minutes earlier that same morning and had read each of the *Miranda* rights to Villalobos in English, individually, and then had the rights translated to her in Tagalog, Villalobos's native language, individually.  Despite understanding the *Miranda* requirements and having a Farsi language agent/interpreter present in the interrogation room, Agent Browning failed to appropriately inform Hersel Neman of his *Miranda* rights.  Accordingly, Hersel Neman did not, and could not, knowingly and intelligently waive his *Miranda* rights.

Courts must determine whether a *Miranda* waiver is knowing and intelligent by reviewing the "totality of the circumstances, including the background, experience, and conduct of defendant." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc) (internal quotation marks and citations omitted). Where, as here, a defendant's native language is not English, the Courts focus on whether the defendant could understand the *Miranda* rights, either verbally or in writing, in a language the defendant understood. *Crews*, 502 F.3d at 1140 (the officer read the defendant his rights in English, "a language Crews fluently spoke and understood without the need of a translator"); *United States v. Gonzalez*, 749 F.2d 1329, 1336 (9th Cir. 1984) (defendant was provided a *Miranda* waiver form in his native language, Spanish, which sufficed in spite of the defendant's poor English); *United States v. Shi*, 525 F.3d 709, 728 (9th Cir. 2008) (defendant was read his *Miranda* rights by an interpreter who maintained a "90 to 95 percent" level of understanding with the defendant and the defendant was given an Advice of Rights form in Mandarin). This is so because "any language difficulties encountered by the defendant are considered to determine if there has been a valid waiver." *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). Indeed, the Ninth Circuit has assumed, without holding, "that if *Miranda* warnings are given in a language which the person being instructed does not understand, a waiver of those rights would not be valid." *United States v. Martinez*, 588 F.2d 1227, 1235 (9th Cir. 1978). This process is intended to provide every person questioned with a genuine understanding of the U.S. Constitution's protections against self-incrimination so that every person, whether born and raised here or not, has a real, equal understanding of our basic rights and truly appreciates that he is entitled to decline to answer questions or can ask for a lawyer before answering any questions.

Hersel Neman was not treated properly when he was interrogated. Agent Browning began Hersel Neman's interrogation at 10:34 a.m. by asking Hersel Neman if he spoke "okay English?" In response, Hersel Neman gestured "so-so" with his hand. At that point, Agent Browning introduced Agent Larrabi, a Farsi speaking agent, who asked

Hersel Neman "Do you speak English well?"  Hersel Neman attempted to convey his limited English language skills by noting that he "underst[ood] it to an extent.  The difficult words."  Agent Larrabi responded by asking Hersel Neman if he wanted him to "translate" for him or when Agent Browning talked to Hersel Neman.  Hersel Neman responded, in broken English "[i]f I didn't understand something."  Agent Larrabi interpreted Hersel Neman's statement to Agent Browning as "[Hersel Neman] prefers to have you talk to him.  He doesn't understand then I'll step in."  Later, before Agent Browning read the *Miranda* rights to Hersel Neman, Hersel Neman made clear to Agent Larrabi that "he's never been read his rights."

After the initial exchange, where Hersel Neman clearly showed his limited English language proficiency, Agent Browning moved forward and read a *Miranda* statement of rights to Hersel Neman, *in toto*, in English without any Farsi translation.  It is not clear why Agent Browning did not have Agent Larrabi translate the *Miranda* statement of rights for Hersel Neman.  Moreover, Agent Browning compounded his error by failing to read, and much less translate into Farsi, each of the *Miranda* rights to Hersel Neman, individually, even though he had just done so minutes before when he questioned Villalobos.  Agent Browning might have been trying to avoid having Hersel Neman understand that he could ask for a lawyer to be present like Villalobos did repeatedly.  After hearing Agent Browning's English only reading of the rights, Hersel Neman evidenced his true lack of understanding by stating "I understand but I don't know if I have to talk or not."  This question to Agent Browning demonstrates Hersel Neman's lack of understanding of his rights.  He does not understand if he has to talk or not.  He could not knowingly and voluntarily waive rights that he did not understand.  When Agent Browning asked Hersel Neman to sign the *Miranda* statement of rights form, Agent Larrabi, speaking in Farsi, asked Hersel Neman "[y]ou can read English, right?"  Hersel Neman did not agree, answering "very little."  In spite of Hersel Neman's statement that he read "very little" English, Agent Larrabi and Agent Browning had Hersel Neman initial and sign an English only *Miranda* statement of rights form.  From

the video, it is clear that Hersel Neman did not look down and did not, and could not, read the English language waiver form.  Of course he did not – he knew he would not be able to read this English language legal form.  Indeed, in what appears to be an attempt to understand the purpose of the English only *Miranda* statement of rights form that he could not read, Hersel Neman asked in Farsi if the form "says here it would be bad for me if I don't do the thing?"  Agent Larrabi, speaking in Farsi, answered Hersel Neman's question affirmatively by stating, "Look. Right," reinforcing Hersel Neman's confusion that the form said he would be punished for failure to cooperate.  Declaration of Ali Hashemi-Alavi, ¶ 4, Ex. 3).

Instead of correcting Hersel Neman's misunderstanding of his rights and reading the *Miranda* statement of rights form in Farsi, Agent Larrabi went on to employ tactics of coercion that have been specifically forbidden by the Ninth Circuit in *United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994), discussed more fully below.  Agent Larrabi equated Hersel Neman's rights to "a *way that you can talk to [the agents] or you may not talk to them."*  No mention was made in Farsi of Hersel Neman's right to remain silent or his right to an attorney.  Hersel Neman apparently only had the right to "talk to the agents."  Agent Larrabi went on to explain that if Hersel Neman did not talk, the agents would tell the U.S. Attorney that he has "not cooperated" or "he hasn't worked with us."  Hersel Neman understood the gist of this threat and asked:  "it would be bad for me if I don't do the thing?"  The Farsi speaking agent responded in Farsi, "look.  right" meaning "correct."  (H. Neman Decl., ¶14).  The agent confirmed for Hersel Neman that if he failed to talk, it would be bad for him.  (H. Neman Decl., ¶14).  Accordingly, the Court must find that Hersel Neman did not knowingly and intelligently waive his *Miranda* rights.

### 3.   **Hersel Neman's Purported *Miranda* Waiver was the Product of Intimidation and Coercion, and Was Thus Not Voluntary**

Even assuming that Hersel Neman waived his *Miranda* rights, which he did not, such purported waiver was not voluntary.  Instead, whatever purported waiver the law

enforcement officers obtained from Hersel Neman was obtained via illegal coercion. Specifically, the law enforcement officers made explicit statements that threatened harsher treatment by the federal prosecutor if Hersel Neman exercised his *Miranda* right to remain silent. Such illegal coercive statements were meant to overcome Hersel Neman's will and force him to waive his *Miranda* right to remain silent. Accordingly, the Court must find that Hersel Neman's purported *Miranda* waiver was not voluntary.

When considering a waiver of *Miranda* rights, the Supreme Court has held that "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. Similarly, a confession is involuntary if the confession was obtained by means of physical or psychological coercion or improper inducement such that the suspect's will was overborne. *United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008). In assessing whether a *Miranda* waiver or subsequent statements were made voluntarily, Ninth Circuit precedent has established that any threat of harsher treatment for exercising a defendant's rights renders any waiver or subsequent statements involuntary. *Harrison*, 34 F.3d at 890-92 ("no circumstance in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor"); *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 n.2 (9th Cir. 1988) ("threatening to inform the prosecutor of a suspect's refusal to cooperate violates her fifth amendment right to remain silent"); *United States v. Tingle*, 658 F.2d 1332, 1336 n.5 (9th Cir. 1981) (same); *See also Collazo v. Estelle*, 940 F.2d 411, 416-22 (9th Cir. 1991) (en banc).

The agents here violated a specific prohibition contained in the Ninth Circuit's *Harrison* decision. In *Harrison*, after agents read the defendant her *Miranda* rights, an agent asked her whether she thought "it would be better if the judge were told that she had cooperated ***or not cooperated***." *34 F.3d at 890* (emphasis added). The forbidden conduct was the mere "suggestion that they might inform the court that she had not cooperated." *Id.* at 891. The court explained that while it may be "'permissible for an

interrogating officer to represent … that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor.  Refusal to cooperate is every defendant's right under the *fifth amendment*.  Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence.  Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations."  *Id.* (quoting *Tingle*, 658 F.2d at 1336 n.5).

The Ninth Circuit in *Harrison* went on to hold that her waiver and statements were **involuntary** because "there are **no** circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment."  *Id.* at 891 (emphasis added).  The fact that "the agents thinly veiled their implied message behind a rhetorical question" made no difference.  *Id.* at 891.  The court emphasized that "[t]he improper conduct was the suggestion that [the agents] might inform the court that she had not cooperated."  *Id.*

Similarly, in *Collazo*, police officers told a *Mirandized* suspect who asked to speak to an attorney that "it might be worse for him" if he talked to an attorney prior to questioning and that "it was in his interest to talk to them without one."  940 F.2d at 413.  The court sought to determine whether the officer's "attempt to discourage [the defendant] from speaking to a lawyer is compatible with a system of justice that does not permit police coercion."  *Id.* at 416.  Ultimately, the Ninth Circuit ruled that defendant's *Miranda* waiver and subsequent statements were involuntary because the officers "effectively told Collazo he would be penalized if he exercised rights guaranteed to him under the Constitution of the United States."  *Id.* at 417.

Here, Agent Browning first informed Hersel Neman that it would be better for Hersel Neman if he cooperated, stating "the more cooperative and honest you are, I think it helps out everybody."  Agent Browning then stated, "[d]on't think of us as fools in this and plus, the more cooperative and honest you are, then I can relay that to the U.S.

DEFENDANT HERSEL NEMAN'S MOTION TO SUPPRESS HIS POST-ARREST STATEMENT

CR 14-00521-JAK

Attorney and she'll take that into account, it's everything, so being cooperative kind of helps everybody out."  Later, after Agent Browning read the *Miranda* rights only in English, *in toto*, to Hersel Neman, Hersel Neman evidenced his confusion by asking "I understand but I don't know if I have to talk or not."  In response, Agent Browning stated "Um, that's what it is saying, it's saying you don't have to talk.  It's up to you, it's your decision to talk to us or not to talk to us. … But like I said before, the cooperation and everything that you do now plays into [unintelligible]."

During the Farsi language discussions with Agent Larrabi regarding the English only *Miranda* statement of rights form, Hersel Neman asked "It says here it would be bad for me if I don't do the thing?" (meaning talk to the agents at that moment).  Agent Larrabi responded:

> "But it is this way that you can talk to them or you may not talk to them.  It means any way you like it.  But they want to speak with you now.  If you speak with them, it most probably help your 'case.'  When he goes to speak with 'U.S. Attorney,' he will tell them this guy has 'cooperated' or **has not 'cooperated**.'  He has worked with us or he **hasn't worked with us**."

(Johnston Decl., ¶ 4, Ex. 1; ¶ 10, Ex. 9; Declaration of Ali Hashemi-Alavi, ¶ 4, Ex. 3 (emphasis added)).  This phrasing "has cooperated or has not cooperated" is nearly identical with the phrasing that Ninth Circuit held was forbidden in *Harrison*.  Agent Larrabi's statement that Hersel Neman's **failure** to "cooperate" or "work" with the agents would be communicated to the prosecutor was a clear violation of the Ninth Circuit's holding in *Harrison*.  As the Ninth Circuit noted in *Harrison*, "'[b]ecause there is no legitimate purpose for the statement that a failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove of the making of such representations.'"  34 F.3d at 891 (quoting *Tingle*, 658 F.2d at 1336 n.5).  The *Harrison* court concluded that "there are no circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher

treatment by a court or prosecutor."  34 F.3d at 891-92 (emphasis in original).

Based on the foregoing, it is clear that Hersel Neman could draw only one inference if he failed to "cooperate" or "work" with the law enforcement officers: he would suffer for his silence.  Hersel Neman's free will was thus overcome as a matter of law, and he believed he had no choice but to sign the form and answer any and all questions.  Accordingly, Hersel Neman's purported *Miranda* waiver was not voluntary and his post-arrest statement must be suppressed because it was coercively obtained.

## B.   HERSEL NEMAN'S STATEMENT WAS ELICITED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL

There is a separate Sixth Amendment violation that necessitates suppression of Hersel Neman's post-arrest statement.  On September 9, 2014, Hersel Neman was indicted by a federal grand jury and on the morning of September 10, he was arrested on the Indictment.  When Hersel Neman was interrogated by law enforcement officers later on the morning of September 10, his Sixth Amendment right to counsel had already attached because of the return of the Indictment the day before and could only be overcome by an express waiver of his Sixth Amendment right to counsel.  Moreover, as the right to counsel had already attached, law enforcement officers could not interfere with Simon Neman's attempts to communicate with Hersel Neman.  As Hersel Neman did not expressly waive his Sixth Amendment right to counsel and law enforcement officers interfered with Simon Neman's attempts to communicate with Hersel Neman, his post-indictment statement must be suppressed.

"[O]nce formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel."  *Michigan v. Harvey*, 494 U.S. 344, 348 (1990) (citing *Massiah v. United States*, 377 U.S. 201, 206 (1964)).  A violation occurs "at the moment of the postindictment interrogation because such questioning 'contravenes the basic dictates of fairness in the conduct of criminal causes.'"  *Kansas v. Ventris*, 556 U.S. 586, 591 (2009) (quoting *Massiah*, 377 U.S. at

206).  The Supreme Court noted "once the right [to counsel] *has* attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a medium between the suspect and the State during the interrogation." *Moran*, 475 U.S. at 428.

"The standard for waiver of the rights under the sixth amendment is the same as that for the fifth amendment, that is, voluntary, knowing and intelligent." *United States v. Binder*, 769 F.2d 595, 599 (9th Cir. 1985); *Patterson v. Illinois*, 487 U.S. 285, 292, n.4 (1988) (citing *Moran,* 475 U.S. at 424, 428).  However, "[t]his does not mean of course that all Sixth Amendment challenges to the conduct of post indictment questioning will fail whenever the challenged practice would pass Constitutional muster under *Miranda*. [While the Supreme Court has] permitted a *Miranda* waiver to stand where a suspect was not told that his lawyer was trying to reach him during questioning; in the Sixth Amendment context, this waiver would not be valid." *Patterson*, 487 U.S. at 297 n.9. That is the circumstance here.

First, as discussed above, Hersel Neman's purported *Miranda* waiver cannot suffice to waive his Sixth Amendment right to counsel at a post-indictment interrogation because he did not understand his *Miranda* rights or the consequences of waiving them and he was coerced into waiving his *Miranda* rights through threats of harsher treatment if Hersel Neman **failed** to "cooperate" or "work" with them.

Second, the Government violated *Patterson* by interfering with Simon Neman's efforts to act as a medium between Hersel Neman and the law enforcement officers questioning him during the interrogation.  This is the extra component of his Sixth Amendment right that is different than his Fifth Amendment right.  In a Fifth Amendment right to counsel case, *Moran*, the Supreme Court addressed a factually similar situation.  After the defendant was arrested, his sister phoned the public defender's office to obtain legal assistance for him.  *Moran*, 475 U.S. at 416.  An attorney from the public defender's office phoned the police station, advised the police she would be representing the defendant, and was told the police would not be questioning the defendant that evening.  *Id.*  Less than an hour later, however, the police questioned the

defendant without advising him that his sister had retained counsel and that the attorney was trying to reach him. *Id.*  In rejecting the defendant's contention that the Sixth Amendment required exclusion of his statements, the Court emphasized that the defendant's Sixth Amendment rights had not yet attached, stating "[t]he difficulty for respondent is that the interrogation sessions that that yielded the inculpatory statements took place before the initiation of adversary judicial proceedings." *Id*. at 428.  However, the Court recognized that "once the [Sixth Amendment right to counsel] attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a medium between the suspect and the State during the interrogation." *Id.*

Here, unlike *Moran*, the interrogation by law enforcement officers occurred after "the initiation of adversary judicial proceedings."  Hersel Neman thus had the right to have his counsel in the interrogation room and the right to be free from the government's interference with his attorney's efforts to represent him during the questioning.  Simon Neman arrived at the Federal Building before Hersel Neman, advised various federal law enforcement officers on multiple occasions that he was there on behalf of Hersel Neman, and demanded that Hersel Neman not be questioned outside of Simon Neman's presence.  However, at no time did law enforcement officers bring Simon Neman to Hersel Neman or stop the questioning.  Thus, it is clear that the government interfered with Simon Neman's efforts to act as a buffer between Hersel Neman and the government, in violation of his Sixth Amendment right to counsel.

## IV.    **<u>CONCLUSION</u>**

In sum, this Court should find that Hersel Neman did not knowingly and voluntarily waive his *Miranda* rights and that all subsequent statements were involuntary.  The Court should also find that the government violated Hersel Neman's Sixth Amendment right to counsel.  This motion should be granted, and Hersel Neman's post-indictment, post-arrest statement should be suppressed on Fifth and Sixth Amendment grounds.

Respectfully submitted,

DATED:  December 4, 2014

**FOLEY & LARDNER LLP**
Pamela L. Johnston

By: __/s/ Pamela L. Johnston__
Pamela L. Johnston

Attorneys for Defendant
HERSEL NEMAN