PAMELA L. JOHNSTON, CA Bar No. 132558
    pjohnston@foley.com
JAIME GUERRERO, CA Bar No. 192211
    jguerrero@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:  213.972.4500
FACSIMILE:   213.486.0065

Attorneys for Defendant
HERSEL NEMAN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>    vs.<br><br>PACIFIC EUROTEX CORP., MORAD NEMAN, HERSEL NEMAN, MEHRAN KHALILI, and ALMA VILLALOBOS,<br><br>                  Defendants. | Case No. 14-CR-00521-JAK<br><br>**DEFENDANT HERSEL NEMAN'S MOTION TO SUPPRESS FORENSIC EXAMINATION OF SMARTPHONE**<br><br>Date:    February 5, 2015<br>Time:   8:30 a.m.<br>Place:  Courtroom 750<br>          Roybal Courthouse<br>          Hon. John A. Kronstadt<br><br>[FARSI INTERPRETER REQUESTED FOR HEARING]<br><br>Trial Date: February 17, 2015 |

## I. INTRODUCTION

On August 6, 2014, customs inspectors conducted a pat down search of defendant Hersel Neman ("Mr. Neman") at the Los Angeles Airport ("LAX") upon Mr. Neman's arrival from Mexico. The customs inspectors did not find any contraband or evidence of violations of customs laws during the pat down search. Special Agent Michael Browning ("SA Browning") of the Department of Homeland Security Investigations ("HSI"), the case agent in this case, was also present at LAX along with his computer forensics team. SA Browning knew when Mr. Neman would be landing at LAX and had more than enough time to obtain a search warrant for Mr. Neman's smartphone. Instead of obtaining a warrant, SA Browning directed another criminal agent to conduct an intrusive, warrantless forensic examination of Mr. Neman's smartphone to find evidence in support of HSI's investigation of alleged money laundering violations by companies in the Los Angeles Garment District ("Garment District companies").

The government cannot save this warrantless search of Mr. Neman's smartphone by claiming that it was conducted as a "border search" – that is a mere pretext for the true situation. Indeed, the Ninth Circuit has noted that "Congress and the courts have specifically narrowed the border searches to searches conducted by customs officials in enforcement of customs laws[.]" Accordingly, the Court should suppress the search of Mr. Neman's smartphone and all extracted data, and fruits thereof.

## II. FACTUAL BACKGROUND

In May 2013, SA Browning and others in law enforcement began investigating Garment District companies for alleged money laundering violations, including the purported use of something the government calls the Black Market Peso Exchange ("BMPE"). (Declaration of Pamela L. Johnston ISO Motion to Suppress ("Johnston Decl."), ¶1, Ex. A). The government was *not* investigating Garment District companies for smuggling narcotics or currency across the Mexico-United States border. (*Id.*).

On May 13, 2013, the government conducted an "educational outreach" and met with co-defendant Alma Villalobos and Mr. Neman, who represented he was an owner of

co-defendant Pacific Eurotex, Corp. ("PEC").  (Johnston Decl., ¶2, Ex. B).  During the May 13, 2013 meeting, the government purportedly gave Mr. Neman an English-language, IRS publication on the requirement to report cash payments of over $10,000 and a copy of an IRS Form 8300.  Thereafter, between May 30, 2013 and August 9, 2013, an undercover agent ("UC") made four deliveries of more than $10,000 in cash to Alma Villalobos at PEC.  (*Id.* at ¶3, Ex. C).  According to the government, PEC did not file the Form 8300s following any of the UC's four deliveries of cash.  (*Id.*).

On August 6, 2014, approximately one year *after* the UC made a final cash delivery on August 9, 2013, SA Browning arranged to have inspectors search Mr. Neman at LAX – without a warrant – when he flew back from Mexico through LAX (Johnston Decl., ¶4, Ex. D).  While at LAX, inspectors conducted a pat down search of Mr. Neman.  (*Id.*).  The inspectors found nothing that was illegal to bring into the country; the inspectors found that Mr. Neman was in possession of approximately $1,000.  (*Id.*).  The inspectors did obtain copies of papers in Mr. Neman's possession, copies of which were later provided to HSI agents.  (*Id.* at ¶5, Ex. E).

In addition to this customs pat down search, however, HSI criminal agents seized, extracted a forensic copy, and then later searched the contents of Mr. Neman's smartphone.  Specifically, HSI Special Agents **Michael Browning**, Joya Walker, Tu Vo, and Kimmesia Sampson traveled to LAX to "execute[] a border search of possessions and a cellular phone belonging to Hersel NEMAN[.]"  (Johnston Decl., ¶5, Ex. E).  SA Tu Vo, from HSI's Computer Forensics Group, plugged in a special device to Mr. Neman's smartphone and conducted an "onsite data extraction" of Mr. Neman's phone, extracting Mr. Neman's "contacts, calls, messages, notes, images, and videos."  (Johnston Decl., ¶6, Ex. F).  The "data extraction" was conducted using UFED 4PC, mobile forensic software.[1]  (*Id.*).

---

[1] According to publicly available information, UFED 4PC is "mobile forensic solution that provides users a cost effective, flexible and convenient tool on their existing PC or laptop."  (Johnston Decl., ¶8).  The UFED 4PC software enables "data extraction, decoding, analysis and reporting on a single platform."  (*Id.*).  Moreover, the software "performs physical, logical, file system and password extraction of all data, including

From the search of Mr. Neman's smartphone, SA Browning learned that Mr. Neman had allegedly "been in contact with an individual known as [redacted] using Mexican telephone number [redacted]."[2] (Johnston Decl., ¶7, Ex. G). Thereafter, the government cross referenced the identified telephone number into a separate DEA investigation. (*Id.*). Specifically, the government used the information obtained from the warrantless forensic examination of Mr. Neman's smartphone to determine that the customer had been in communication with an individual who purportedly managed a "'casa de cambio' in Mexico and [wa]s believed to be a peso broker." (*Id.*).

### III. THE WARRANTLESS SEARCH OF HERSEL NEMAN'S SMARTPHONE WAS UNCONSTITUTIONAL AND ALL DATA EXTRACTED AND FRUITS THEREOF SHOULD BE SUPPRESSED

The government did *not* conduct the forensic examination of Mr. Neman's smartphone pursuant to a search warrant. The government did *not* conduct the forensic examination because it had a "reasonable suspicion" that Mr. Neman was smuggling contraband or money into the United States or violating any other immigration or customs law. Instead, the criminal agents in hindsight characterized the warrantless search of Mr. Neman's smartphone as a "border search of possessions belonging to Hersel NEMAN." (Johnston Decl., ¶6, Ex. F).

In reality, the government conducted the forensic examination of Mr. Neman's smartphone as part of its ongoing criminal investigation into the alleged laundering of narcotics proceeds through payments to legitimate garment district companies. The government thus used the pretext of a "border search" with its reduced standard to conduct a full-blown, forensic warrantless search of Mr. Neman's smartphone which resulted in the government collecting private data and phone call information. The government knew Mr. Neman was arriving at LAX from Mexico and arranged to have

---

hidden and deleted, from the widest range of mobile devices[.]" (*Id.*).

[2] In an unredacted version of the document provided by the government, the name and number of a Pacific Eurotex customer are identified.

CBP officers search Mr. Neman. Given the duration of the flight, the government had more than ample time to apply for (and potentially obtain) a search warrant authorizing the forensic examination of Mr. Neman's smartphone. The agent cut a corner, skipped getting a warrant, and then covered up his mistake by calling it a "border search," when it was, in truth, a normal law enforcement tactic conducted to obtain private information from a target of a criminal investigation. Mr. Neman was indicted one month after the agent conducted this illegal search. The government's warrantless search of Mr. Neman's smartphone was unconstitutional, and the resulting evidence must be suppressed.

### A. THE FOURTH AMENDMENT'S WARRANT REQUIREMENT

"[W]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing," the *Fourth Amendment's* requirement of reasonableness, "generally requires the obtaining of a judicial warrant." *Riley v. Scott*, 134 S. Ct. 2473, 2482 (2014). The warrant requirement ensures that the search is based on reasonable inferences drawn from a "neutral and detached magistrate" and not the judgment of an officer "engaged in the often competitive enterprise of ferreting out crime." *Id.* (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948)). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.* (citing *Kentucky v. King*, 131 S. Ct. 1849 (2011)). In determining whether an exception should apply, courts must assess "'on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Riley*, 134 S. Ct. 2484.

### B. BINDING PRECEDENT REQUIRES THAT AGENTS OBTAIN A SEARCH WARRANT TO CONDUCT A FORENSIC EXAMINATION OF A SMARTPHONE

In December 2013, the Ninth Circuit held that a warrantless forensic examination of an electronic device at the border required a showing of "reasonable suspicion[.]" *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013). However, the Supreme

-4-
14-CR-00521-JAK
4822-2611-3825.1

Court's June 2014 decision in *Riley v. California* as well as the Ninth Circuit's December 11, 2014 decision in *United States v. Camou,* 2014 U.S. App. LEXIS 23347 (9th Cir. Dec. 11, 2014) reduce the reach of *Cotterman*.

In *Riley*, decided in June 2014 – approximately seven months after *Cotterman* and nearly two months before the seizure in this case – the Supreme Court held that a warrant is required before a forensic examination of a cell phone may occur, even when a cell phone is seized incident to arrest. *Riley*, 134 S. Ct. at 2493. The Court recognized that "[m]odern cell phones are not just another technological convenience. With all they may reveal, they hold for many Americans 'the privacies of life.'" *Id.* at 2494-95 (citing *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The Court further recognized that individuals "who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." 134 S. Ct. at 2490.

Both the *Riley* and *Cotterman* courts acknowledged that these advancements in technology give law enforcement access to much more than previously possible. As the *Riley* Court put it, "[p]rior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day." *Riley*, 134 S. Ct. at 2490. Similarly, the *Cotterman* court noted that "[t]he amount of private information carried by international travelers was traditionally circumscribed by the size of the travelers luggage or automobile." *Cotterman*, 709 F.3d at 964.

The *Riley* Court found that an arrestee's "diminished privacy interests [did] not mean that the Fourth Amendment falls out of the picture entirely." 134 S. Ct. at 2488. The *Riley* Court acknowledges that "when 'privacy-related concerns are weighty enough" a "search may require a warrant, notwithstanding the diminished expectations of privacy of an arrestee.'" *Id.* (citing *Maryland v. King*, 133 S. Ct. 1958, 1979 (2013)). The *Cotterman* court acknowledged that "[n]otwithstanding a traveler's diminished expectation of privacy at the border, the search is still measured against the *Fourth Amendment's* reasonableness requirement, which considers the nature and scope of the search." 709 F.3d at 963.

Yet in *Riley*, the Court likened allowing law enforcement officers to rummage through data on a cell phone in an unrestrained search for evidence of criminal activity to the "reviled 'general warrants' and 'writs of assistance'" that the Fourth Amendment was meant to prevent. 134 S. Ct. at 2494. As the *Riley* Court stated, "[t]he fact that technology now allows an individual to carry such information in hand does not make the information any less worthy" of Fourth Amendment protection. *Id.* at 2495.

Subsequent to *Riley*, on December 11, 2014, the Ninth Circuit held in *Camou* that a cell phone could not be searched as a container under the vehicle exception. The *Camou* court held that "[j]ust as '[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person,' so too do cell phones differ from any other object officers might find in a vehicle." 2014 U.S. App. LEXIS 23347, *22-23 (citing *Riley*, 134 S. Ct. at 2489).

Taken together, these cases stand for the proposition that the contents of a person's smartphone are entitled to full Fourth Amendment protection and when a law enforcement officer conducting a long-term criminal investigation extracts all the sensitive data using special tools and special software out of that smartphone without a warrant when he had sufficient time to get a warrant, that search is illegal. The fact that the extraction occurred at LAX does not change this analysis, and the agent's attempt to cast the search as a "border search" does not save the search from suppression.

### C. THE SEARCH OF MR. NEMAN'S SMARTPHONE WAS NOT A REAL "BORDER SEARCH"

Even assuming the border search exception for searches of smartphones survives after *Riley* and *Camou*, the government's forensic examination of Mr. Neman's smartphone at LAX was not a proper "border search." Instead, the government used the pretext of a border search to conduct an intrusive search of Mr. Neman's smartphone for general law enforcement purposes. Specifically, the government sought to bolster its ongoing investigation into the alleged laundering of narcotics proceeds through payments to legitimate garment companies on behalf of Mexican customers. The Ninth Circuit has

1  stated that border searches cannot be used to conduct searches for general law
2  enforcement purposes.  Accordingly, the Court should suppress the evidence obtained
3  from Mr. Neman's smartphone during the warrantless forensic examination.

4        While border searches are a long recognized exception to the warrant requirement,
5  border searches exist as "a *narrow* exception to the *Fourth Amendment* prohibition
6  against warrantless searches …."  *Cotterman*, 709 F.3d at 960 (emphasis added).  "The
7  Government's interest in preventing the entry of unwanted persons and effects is at its
8  zenith at the international border[.]"  *United States v. Flores-Montano*, 541 U.S. 149, 152
9  (2004).  Accordingly, border searches are generally deemed "reasonable simply by virtue
10 of the fact that they occur at the border."  *United States v. Ramsey*, 431 U.S. 606, 616
11 (1977).  Indeed, the *Ramsey* Court noted that the "'border search' exception is not based
12 on the doctrine of 'exigent circumstances' at all."  *Id.* at 621.  Instead, the *Ramsey* Court
13 noted that the "border search" exception was a "longstanding, historically recognized
14 exception to the Fourth Amendment's general principle that a warrant be obtained, and in
15 this respect is like the similar 'search incident to lawful arrest" exception[.]"  *Id.*

16       "Under this doctrine, **customs officials** may conduct searches at the international
17 border to identify the illegal transportation of contraband or undeclared articles across the
18 border."  *United States v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008) (emphasis added).  In
19 *Seljan*, the Ninth Circuit concluded that a suspicionless cursory scan of a package in
20 international transit was not unreasonable.  *Id.* at 1004.  Similarly, the Ninth Circuit
21 previously approved a quick peek, but not a full search, of a laptop.  *United States v.*
22 *Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008) (permitted:  "CBP officers simply 'had [the
23 traveler] boot [the laptop] up, and looked at what [he] had inside.'").

24       However, this power is not unfettered.  This authority applies only to the
25 enforcement of customs laws and does not justify other searches at a border for "general
26 law enforcement purposes[.]"  *United States v. Soto-Soto*, 598 F.2d 545,548-550 (9th Cir.
27 1979).  Moreover, the exception does not mean that at the border, "anything goes."
28 *Seljan*, 547 F.3d  at 1000.  Even at the border, individual privacy rights are not

abandoned but "[b]alanced against the sovereign's interests." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985).

*Soto-Soto* is directly contrary to the government's approach. In *Soto-Soto*, the Ninth Circuit upheld the suppression of evidence seized during a warrantless border search by an FBI agent looking for stolen vehicles. 598 F.2d at 548-49. In *Soto-Soto*, the government contended that 19 U.S.C. § 482, which authorizes search of "any vehicle, beast, or person" on which or whom authorized agents "suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law," exempted every search at the border from the warrant requirements of the *Fourth Amendment*. *Id*. at 547-48. The court rejected this contention because the search failed to meet the criteria of a valid border search: (1) the FBI agent was not a customs or immigration officer; and (2) the purpose of the search was not to enforce importation laws but rather for general law enforcement purposes. *Id.* at 549. The Ninth Circuit found that if the agent had made the "search in pursuit of general law enforcement away from the border, there would be no question that the search was illegal." *Id.* The court rejected the government's attempt to "justify the search on the mere basis that it occurred at the border." *Id.* Instead, the Ninth Circuit noted that "Congress and the courts have specifically narrowed the border searches to searches conducted by customs officials in enforcement of customs laws[.]" *Id.* SA Vo, who is not a customs inspector, conducted an intrusive, forensics search of the smartphone in order to assist SA Browning in his criminal investigation of Mr. Neman. When he did so, he violated the rule set forth in *Soto-Soto*. The search was not a true border search, regardless of its location.

Here, Mr. Neman does not dispute that customs inspectors had the authority to conduct a simple search to see if he had violated the customs laws when he arrived at LAX from Mexico; indeed, even a pat down search would be consistent with a border search. However, the government did not stop after the results of the customs inspector's pat down returned negative results. HSI agents traveled to LAX to conduct a highly

intrusive forensic examination of Mr. Neman's smartphone. Indeed, SA Vo used special software, UFED 4PC, to extract all of the data on Mr. Neman's smartphone, including "contacts calls, messages, notes, images, and videos." (Johnston Decl., ¶ 6, Ex. F). Moreover, in their report summarizing the "inbound examination" of Mr. Neman's smartphone, HSI agents note that the search was conducted as part of its investigation "targeting DTOs and co-conspirators utilizing the Los Angeles garment trade to launder narcotics proceeds from the United States to Mexico." (*Id.* at ¶ 5, Ex. E).

The HSI agents did not, because they could not, articulate that they were using the forensic examination of Mr. Neman's smartphone to "identify the illegal transportation of contraband or undeclared articles across the border." *Seljan*, 547 F.3d at 999. The agents did not conduct the forensic examination for the purposes of enforcing customs laws. SA Browning, who was present during the forensic examination, has been involved in this investigation since its inception in May 2013. (Johnston Decl., ¶ 1, Ex. A). His report of investigation states that Mr. Neman was targeted as an "officer and registered agent of Pacific Eurotex Corp., which is a business under investigation for money laundering tied to the Black Market Peso Exchange (BMPE) in Mexico." (*Id.* at ¶ 7, Ex. G).

Based on the foregoing, it is clear that the government did not, in fact, conduct a "border search." Instead, the forensic examination was a general law enforcement search, and the results should be suppressed for violating the Fourth Amendment.

### D. THE GOVERNMENT DID NOT HAVE "REASONABLE SUSPICION" TO CONDUCT A "BORDER SEARCH"

If the Court believes that only "reasonable suspicion" was required (defendant disagrees with this standard for the reasons discussed above), even under that standard the seizure should be suppressed. The government did not have a "reasonable suspicion" to believe that incriminating evidence existed on Mr. Neman's smartphone on August 6, 2014. The HSI agents who conducted the "border search" did so to further their investigation of the purported BMPE in Mexico. They stated in their report that they conducted the search because Mr. Neman is a principal officer of PEC and PEC "was

under investigation for money laundering." (Johnston Decl., ¶5, Ex. E).

In *Cotterman*, the Ninth Circuit defined a "reasonable suspicion" as "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (citation omitted). Ultimately, the *Cotterman* court found that border agents had reasonable suspicion that the defendant was attempting to violate customs laws by smuggling child pornography into the United States. *Id.* at 968-70.

Here, there is no evidence listed in the reports that reflects that the inspectors had a reasonable suspicion that the smartphone contained evidence of a customs violation. Indeed, the government's reports indicate that the reason Mr. Neman was stopped was because he was identified as a principal officer of PEC.

## IV. CONCLUSION

In sum, this Court should find that the forensic examination of Mr. Neman's smartphone was unconstitutional because it was not part of a genuine "border" search and should suppress all evidence derived directly or indirectly from the Government's unlawful forensic examination of Mr. Neman's phone.

DATED: January 22, 2015        **FOLEY & LARDNER LLP**
                               Pamela L. Johnston


                               By:  */s/ Pamela L. Johnston*
                                    Pamela L. Johnston
                                    Jaime Guerrero

                                    Attorneys for Defendant
                                    HERSEL NEMAN